Opinion issued November 21, 2023



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-22-00548-CV

———————————

## TAREK MOHAMED ZAGHLOUL, Appellant

## V.

## MAY A. ELSAYED, Appellee

---

### On Appeal from the 387th District Court
### Fort Bend County, Texas
### Trial Court Case No. 19-DCV-258362

---

### MEMORANDUM OPINION

Appellant Tarek Mohamed Zaghloul appeals the trial court's final judgment rendered after a bench trial in the divorce action brought by appellee May A. Elsayed. In five issues, Tarek challenges the trial court's characterization of the

parties' residence as community property and its division of the marital estate. We affirm.

## Background

Tarek and May were married in Cairo, Egypt on December 15, 2002. They have four children, O.Z., M.Z., Y.Z., and L.Z. At the time of trial, the children were 18, 16, 14, and 12 years old, respectively. Tarek and May ceased living together in October 2018.

### A.    Procedural History

On January 2, 2019, May filed her original petition for divorce on the grounds of insupportability and cruel treatment by Tarek. May sought to be appointed sole managing conservator of the children due, in part, to Tarek's alleged history or pattern of family violence during the two-year period preceding the filing of her divorce petition. May requested that the trial court divide their estate in a just and right manner if the parties did not reach an agreement about its division, and that she be awarded a disproportionate share of the parties' estate. May requested that the trial court reimburse the community estate for funds or assets expended by the community estate for the benefit of Tarek's separate estate. May also requested temporary orders concerning use of the parties' marital residence in Katy, Texas (the Indiangrass residence) and with regard to the children. Tarek answered asserting a general denial.

2

Salwah Sayed Moshah, Tarek's mother, intervened in the divorce action alleging that she was the owner of an interest in the Indiangrass residence based on a contract between Tarek and Mohamed Mohktar Zaghloul, Salwah's late husband and Tarek's father. Salwah sought a declaratory judgment that she was entitled to enforce her right to reclaim possession of the property under the contract as sole heir to her late husband's estate.

May counterclaimed disputing the validity of the contract between Mohamed and Tarek on the grounds that it was unenforceable because it purported to sell, encumber, or convey the marital homestead in violation of Texas law. May sought a declaratory judgment that (1) she and Tarek owned the property; (2) the contract between Tarek and Mohamed did not convey any ownership interest or create an encumbrance on the property; (3) the property was community property; and (4) Salwah had no valid ownership, possessory interest, or encumbrance on the property.

Salwah moved for traditional summary judgment on her amended petition in intervention arguing that title to the Indiangrass residence rested with her. In support of her argument, Salwah asserted that May had executed an affidavit stating that the residence was not part of the marital estate and that she had no claim to it, and that Tarek had subsequently signed a special warranty deed transferring his interest in the Indiangrass residence to Salwah. In her summary judgment response, May contested the validity of the affidavit arguing that she did not execute it voluntarily

but rather signed it under duress, and the Indiangrass residence was community property subject to a just and right division upon divorce. The trial court did not rule on Salwah's summary judgment motion.

On September 22, 2021, Tarek filed a counterpetition for divorce on the grounds of insupportability. He sought a just and right division of the marital estate in the event the parties did not reach an agreement and requested temporary orders related to the children and the marital estate. Tarek amended his counterpetition for divorce adding a claim for reimbursement to his separate estate for funds or assets expended by May for the benefit of her business, alleging fraud on the community property estate, and asserting tort claims for false light, intentional infliction of emotional distress, and forgery.

## B. The Trial

The trial spanned ten days in February and March 2022. On the first day, the trial court stated that "we are going to proceed on the intervention first [and] try the characterization of real estate" after which it would proceed with the divorce. The trial court heard testimony from Salwah, May, and Tarek.

### 1. Petition in Intervention

Salwah testified that Mohamed and Tarek entered into a contract for the purchase of the Indiangrass property on May 6, 2006. She testified that Mohamed and Tarek agreed that Tarek would purchase the real property where the house would

be built because Tarek held a green card, and that Mohamed would own the property and pay the mortgage and property taxes on the house. Salwah testified that Tarek and his family would live at the property for ten years after which the property would be transferred to Mohamed and Salwah.

Salwah testified that she inherited Mohamed's property, including the Indiangrass residence, when Mohamed passed away in 2013. Salwah requested that the property be transferred to her, and Tarek executed a special warranty deed dated July 11, 2020, conveying the Indiangrass property to her. Salwah testified that she did not discuss ownership of the house with May but that May knew that Salwah owned the property. Salwah testified that she made numerous payments to Tarek totaling more than $100,000 to pay the mortgage and insurance on the Indiangrass residence between 2016 and 2021 after Mohamed passed away. Copies of the 2006 contract, special warranty deed, and Salwah's bank statements between 2016 to 2021 were admitted into evidence at trial.

Salwah testified that she did not initially pay the mortgage or property insurance directly but instead made cash transfers to Tarek so that he could make the payments. She testified that she began making mortgage payments on the Indiangrass residence directly from her bank account to the mortgage holder in 2019. Salwah testified that she was aware Tarek and May had entered into a sale agreement with a home builder for construction of the Indiangrass residence in May 2006, and

5

that they had refinanced the home loan in 2012. The sale agreement and the refinance agreement, signed by Tarek and May, were admitted into evidence.

At Salwah's urging, Tarek asked May to sign an affidavit acknowledging that May had no ownership interest in the Indiangrass residence. On November 23, 2019, May signed an affidavit averring, "I acknowledge and affirm that the house [in] Katy, Texas [] is not part of the marital property, and I have no claim to it in a divorce." Salwah testified that Tarek did not accompany May to the bank to notarize the affidavit and that May went by herself. On cross-examination, Salwah acknowledged that she was in Egypt at the time May signed the affidavit and that Tarek told her May went to the bank by herself.

May testified that she never personally made a payment for the mortgage, insurance, or property taxes on the Indiangrass residence. She testified that the payments were always made from the couple's joint bank account. May testified that she signed an affidavit in front of a notary public at a bank on November 23, 2019.

May testified that activity in the divorce action was paused in April or May 2019 while she and Tarek attempted to reconcile because one of their children was hospitalized. After reconciliation failed, May filed an application for protective order in June 2020.

May testified that she was not aware of the contract between Tarek and his father until she filed for divorce. She knew money was being transferred into their

joint bank account from Egypt and believed that it came from Tarek's businesses in Egypt. May testified that she was not aware of any money Tarek received from his father and that Tarek never told her that his mother was sending money to the couple to pay the mortgage on the Indiangrass residence.

May testified that she and Tarek decided to buy a home in Texas and they made every decision regarding the details of its construction together. May testified that she and Tarek purchased a BMW during their marriage while they lived in Egypt. Before moving to the United States, they sold the car for $75,000 and used the money for a down payment on the Indiangrass residence.

May testified that she and Tarek entered into a sale agreement with a home builder for the construction of the Indiangrass residence. The sale agreement lists Partners in Building, L.P. as "Seller" and Tarek and May as "Buyers." Tarek and May initialed each page of the agreement and signed it. A Special Warranty Deed with Vendor's Lien, dated December 19, 2006, lists Tarek, "A Married Person," as Grantee and Partners in Building, L.P. as Grantor. May testified that she and Tarek refinanced the house on August 27, 2012. The Co-Ownership Commitment Agreement, reflecting the terms of the mortgage refinance, was signed by Tarek and May. The Sale Agreement, Special Warranty Deed, and Co-Ownership Commitment Agreement were admitted into evidence.

May testified that Tarek told her they were going to purchase a home in the United States and that it would be their family home, and that he never told her that the Indiangrass residence was being purchased for Tarek's father. She testified that she was not employed when they purchased the home because Tarek wanted her to stay home and take care of their children. May testified that she did not believe the contract between Tarek and his father existed prior to her filing for divorce.

May testified that, prior to signing the affidavit in November 2019, the home environment was very chaotic and Tarek regularly intimidated her and the children. She testified that Tarek kept guns around the house, had punched holes in the wall, and knocked their daughter's bedroom door down. She testified that Tarek prepared the affidavit, took her to the bank, and stayed with her until it was notarized. She testified that Tarek told her she had to sign it. When May asked why, Tarek threatened to take the children to Egypt and to hurt May's mother and sister, who still lived in Egypt, if she did not sign the affidavit. May testified that she signed the affidavit because she was terrified of Tarek and did not want to lose her children or risk her family's safety. She did not become aware of the special warranty deed that Tarek executed purportedly transferring the Indiangrass residence to Salwah until after May had filed for divorce.

Tarek testified that he entered into a contract with his father in 2006 so that his father could use Tarek's status as a greencard holder to invest in real estate and

8

Tarek, May, and the children could live in the home for free. He testified that his father sent him money to pay the mortgage and costs related to the house. Tarek testified that Salwah began making the mortgage payments for the Indiangrass residence after his father's death. Tarek testified that he later deeded the house to his mother on July 11, 2020, because she was the rightful owner. He testified that all the funds used to pay for the mortgage, insurance, property taxes, and other home-related costs came from his parents.

Tarek testified that he and May agreed on the language of May's affidavit and that he did not take her to the bank to have it notarized. He denied telling May that he would take the children to Egypt or harm May's family if she did not sign the affidavit. Tarek testified that May knew about the contract he entered with his father because he told her about it. Tarek testified that May's name was included on the sale agreement and other residential financing documents because the finance companies told him that under Texas law a wife must be made aware that her husband is buying property. He testified that he and May did not buy a BMW together but that his father gave it to him as a gift. He testified that he used the proceeds from the sale of the BMW to buy his car and May's car and not for a down payment on the Indiangrass residence, and that his father made the down payment on the residence.

In its oral rendition, the trial court found that May and Tarek signed the sale agreement for the Indiangrass residence during the marriage and, therefore, the residence was community property. The court further found that the community property presumption had not been overcome. The court denied Salwah's petition in intervention.

### 2. Division of Marital Estate

The trial court heard evidence related to the custody of the children and the division of the marital estate over nine days.[1] At the conclusion of trial, the court orally granted the parties' divorce on the ground of insupportability. The court entered a final decree of divorce on May 6, 2022, dissolving the marriage and appointing the parties as joint managing conservators of the children with May to have the exclusive right to designate the children's primary residence.

The final decree also divided the parties' marital estate. The property awarded to Tarek included (1) several bank accounts; (2) stocks, bonds, and securities in connection with an investment account; (3) the sole proprietorship of Zaghloul Stud and Zag Consultancy and Brokerage (Zaghloul Consultancy); (4) his membership interest in EZ World Transport, LLC, Z Development, LLC, and Z Traders Trade

---

[1] Because Tarek does not challenge on appeal the trial court's rulings regarding conservatorship of the children, we do not address that portion of the final divorce decree or the evidence presented related to that issue to the extent it is unnecessary to our disposition of this appeal. *See* TEX. R. APP. P. 47.1.

and Distribution; and (5) the Indiangrass residence, subject to an owelty of partition upon sale of the residence. The property awarded to May included (1) several bank accounts; (2) the amount of $203,700.00 to be paid to May by Tarek or, upon sale of the Indiangrass residence, 35.85% of the net sale proceeds; and (3) her membership interest in Fewlly, LLC. The decree also awarded each party various property in their possession, including cash, vehicles, furniture, clothing, and jewelry.

The decree set forth provisions relating to payment for and sale of the Indiangrass residence. It ordered that Tarek either pay May the sum of $203,700.00 by refinancing the marital property with a cash-out option to pay May or, if he was unable to refinance the property, that the property be sold and that Tarek receive 64.15% of the sale proceeds, or $338,113.48, and May receive 35.85% of the proceeds, or $188,953.52. Assuming the property sold at the stated value, when these figures were added to the remaining assets awarded to each party, Tarek was awarded a total of $456,786.03 (approximately 63%) and May was awarded $272,655.52 (approximately 37%) of the marital assets. The trial court apportioned $322,459.00 (approximately 85%) of the parties' debt to Tarek and $55,086.00 (approximately 15%) of the debt to May. Based on the trial court's distribution of assets and allocation of debt, the difference in net community estate awarded to the

parties was $83,240 with Tarek being awarded $134,327.03 in net assets and May being awarded $217,568.52 in net assets.

In response to Tarek's request, the trial court issued written findings of fact and conclusions of law on July 1, 2022. Regarding division of the marital estate, the trial court found that the total value of the community estate assets was $729,441.55 at the time of trial[2] and that the community estate had debts and liabilities in the amount of $404,447.00.[3] The trial court enumerated the factors it took into consideration in determining a just and right division of the marital estate.

Tarek filed an objection to rendition of an owelty lien and sale of the residence, and a request for ruling. He later filed a motion to modify judgment and motion for new trial. The objection and motions were overruled by operation of law. This appeal followed.

---

[2]    The community estate assets consisted of (1) the Indiangrass residence valued at $568,230.00, with a mortgage liability of $41,163.00, for a net community value of $527,067.00; (2) various financial accounts totaling $103,744.55; (3) vehicles totaling $7,129.00; (4) business interests/stock with a total value of $81,001.00; and (5) miscellaneous property (including household furnishings, jewelry, and gold coins) totaling $10,500.00.

[3]    The calculation of debt consisted of bank, credit card, and hospital accounts, and various loans. The decree did not apportion two debts listed in the trial court's written findings: A Chase United card in the amount of $5,000 and a Discover card in the amount of $21,857.

## The Indiangrass Residence

In his first three issues, Tarek contends that the trial court erred in (1) applying the community property presumption to determine title to the Indiangrass residence; (2) finding that the Indiangrass residence was part of the community estate; and (3) awarding the Indiangrass residence to Tarek and divesting May of "all right, title, interest, and claim in and to that property" and then ordering the property be sold via an owelty of partition in the amount of $203,700.00.

### A.    Standard of Review

We review the trial court's characterization of property under an abuse of discretion standard. *Rosensky v. Rosensky*, No. 01-09-01029-CV, 2011 WL 743164, at *3 (Tex. App.—Houston [1st Dist.] Mar. 3, 2011, no pet.) (mem. op.); *Raymond v. Raymond*, 190 S.W.3d 77, 80 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Robles v. Robles*, 965 S.W.2d 605, 613 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). We determine the issue of whether property is separate or community in nature by looking to the facts that, according to rules of law, give character to the property. *Raymond*, 190 S.W.3d at 80 (citing *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App. —Houston [1st Dist.] 1995, writ denied)). A trial court abuses its discretion when its decision is arbitrary, unreasonable, and without reference to guiding principles. *In re A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019). A trial court does not abuse its discretion if there is some evidence of a substantive

and probative character to support the decision. *Raymond*, 190 S.W.3d at 80 ("If there is any evidence to support the finding, the appeals court must uphold the finding.").

To determine whether there is legally sufficient evidence to support a finding, an appeals court considers only the evidence and inferences that support the finding and disregards all evidence and inferences that support the contrary. *Id.* (citing *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex. 1988)); *Robles*, 965 S.W.2d at 615. If there is any evidence to support the finding, the appeals court must uphold the finding. *Sherman*, 760 S.W.2d at 242. To determine whether the evidence was factually sufficient to support a finding, an appeals court considers and weighs all evidence that was before the trial court. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). An appeals court sets a finding aside only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* Similarly, a trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Herbage v. Snoddy*, 864 S.W.2d 695, 698 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

The trial court's findings of fact in a bench trial have the same weight as a jury verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Jackson v. Gould*, No. 01-16-00203-CV, 2016 WL 5957214, at *2 (Tex. App.—Houston [1st Dist.] Oct. 13, 2016, no pet.) (mem. op.). When findings of fact are filed and

14

unchallenged, "they are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Grupa v. Basset*, No. 01-14-00524-CV, 2015 WL 3423541, at *1 (Tex. App.—Houston [1st Dist.] May 28, 2015, pet. denied) (mem. op.). To determine a "no evidence" or "matter of law" point, we must disregard all evidence contrary to the trial court's finding, and if there is any remaining evidence which would support the verdict or judgment, the trial court's judgment must be upheld. *McGalliard*, 722 S.W.2d at 696–97.

## B.      Classification of Property

The Family Code defines a spouse's separate property as property "owned or claimed by the spouse before marriage" or "acquired by the spouse during marriage by gift, devise, or descent[.]" TEX. FAM. CODE § 3.001; *see* TEX. CONST. art. XVI, § 15 ("All property, both real and personal, of a spouse owned or claimed before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse . . . ."). Community property, on the other hand, is "property, other than separate property, acquired by either spouse during marriage." TEX. FAM. CODE § 3.002; *see Brown v. Wokocha*, 526 S.W.3d 504, 508 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Community property is all property that was acquired by either spouse during the marriage that is not separate property."). There is a statutory presumption that all property "possessed by either spouse during or on dissolution

15

of marriage is . . . community property." TEX. FAM. CODE § 3.003(a); *see Brown*, 526 S.W.3d at 509.

To overcome the community property presumption, the spouse claiming separate property must establish that fact through "clear and convincing evidence." TEX. FAM. CODE § 3.003(b); *see Brown*, 526 S.W.3d at 509. "Clear and convincing" evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Vallalpando v. Vallalpando*, 480 S.W.3d 801, 806 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

The classification of property as either separate or community property is determined by its character at the inception of title. *Goode v. Garcia*, No. 01-20-00143-CV, 2021 WL 6015296, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21. 2021, no pet.) (mem. op.) (citing *In re Marriage of Stegall*, 519 S.W.3d 668, 674 (Tex. App.—Amarillo 2017, no pet.) ("The character of the property as community or separate is established by the inception-of-title doctrine.") (citing *John Hancock Mut. Life Ins. Co. v. Bennett*, 128 S.W.2d 791, 795 (Tex. 1939))). "Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested." *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

## C. Findings of Fact

As relevant here, the trial court made the following findings:

***Findings of Fact – Intervention:***

. . . .

3. The real property residence located at [] at the time the purchase contract/original contract was signed by both parties, MAY A. ELSAYED and TAREK MOHAMED ZAGHLOUL, the parties were married and therefore the property is found to be the community property of MAY A. ELSAYED and TAREK MOHAMED ZAGHLOUL.

4. The presumption that the real property residence located at [] which was acquired during the marriage is community property was not overcome by the evidence presented through testimony and exhibits.

5. The Special Warranty Deed executed by TAREK MOHAMED ZAGHLOUL as Grantor on July 11, 2022[4] which is recorded as instrument #2020086183 in the Deed of Trust Records of Fort Bend County, Texas is declared VOID due to lack of joinder by the spouse of TAREK MOHAMED ZAGHLOUL, that being MAY A. ELSAYED.

6. The Court finds that the transfer of wife's community in the real property residence located at [] to TAREK MOHAMED ZAGHLOUL's mother/Intervenor, SALWA[H] SAYED MOSBAH, was inappropriate and without the wife's consent and that husband cannot transfer wife's community interest in the residence without wife's consent.

7. On February 7, 2022, the Court commenced and concluded the trial regarding the Intervention of Salwa[h] Sayed Mosbah and after hearing the testimony and considering the evidence denied the Intervention filed by SALWA[H] SAYED MOSBAH.

---

[4] The deed was executed on July 11, 2020.

**D.    Characterization of Indiangrass Residence**

In his first issue, Tarek contends that the trial court erred in applying the community property presumption to determine title to the Indiangrass residence. Specifically, he challenges the trial court's Finding of Fact No. 4: "The presumption that the real property residence located at [Indiangrass] which was acquired during the marriage is community property was not overcome by the evidence presented through testimony and exhibits." He argues that the community property presumption is narrowly tailored to only one particular purpose, that is, when one party wants to show that property acquired during marriage was separate property. Tarek argues that this issue was not before the trial court. Instead, he asserts that the legal question raised by Salwah was who had equitable title to the residence. He argues that, in this context, Salwah (and Mohamed's estate) was not required to overcome the community property presumption and the trial court erred in applying it.

Contrary to Tarek's argument, the issue of the character of the Indiangrass residence as separate property or community property was squarely before the trial court, and the parties sought a determination from the court regarding the character of the property. Following the close of evidence at the hearing on Salwah's petition in intervention, Salwah's counsel argued that there was no evidence presented "that actually conflicts with the house being characterized as separate property," and

"because the legal documents don't create any situation that is incompatible with this house being separate property, that's the only solution we can reasonably come to." Tarek's counsel argued, "I believe we have overcome the community property presumption and we have presented evidence that it's separate property." May's counsel argued that, under Family Code section 3.003 and the inception-of-title doctrine, the Indiangrass residence was community property because it was acquired during the parties' marriage and Tarek failed to overcome the community property presumption. Tarek's argument on appeal—that the character of the Indiangrass property was not at issue before the court but rather only who had equitable title to the residence—does not comport with his arguments before the trial court. *See Greenville v. Bills*, No. 01-19-00264-CV, 2020 WL 1942457, at \*8 (Tex. App.—Houston [1st Dist.] Apr. 23, 2020, no pet.) (mem. op.) (noting that to preserve error for appellate review party's argument on appeal must comport with its argument in trial court); *Pajooh v. Miller*, No. 01-16-00927-CV, 2018 WL 3233466, at \*5 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (same).

In his second issue, Tarek contends that the trial court erred in finding that the Indiangrass residence was part of the community estate. Instead, he argues, the evidence was legally and factually sufficient for the trial court to find that the residence was owned by Mohamed's estate. He also asserts that May failed to carry her burden to challenge the signing of her affidavit on the ground of duress.

19

The trial court heard evidence that Tarek and May were married on December 15, 2002. The evidence showed that Tarek and May entered into a sale contract for the Indiangrass residence on May 17, 2006, and that the sale closed in December 2006 while the parties were married. *See* TEX. FAM. CODE § 3.002 (noting community property is "property, other than separate property, acquired by either spouse during marriage"); *see Brown*, 526 S.W.3d at 508.[5] The trial court also heard evidence that Tarek and May refinanced the house on August 27, 2012, and that the agreement reflecting the terms of the mortgage refinance was signed by Tarek and May while still married.

To overcome the community property presumption, Tarek had to establish the character of the Indiangrass residence as separate property through "clear and convincing evidence." TEX. FAM. CODE § 3.003(b); *see Brown*, 526 S.W.3d at 509. Tarek testified that he and his father entered into a contract in 2006 under which his father would pay for the Indiangrass residence while Tarek, May, and their children would live there for free. Tarek testified that his father sent him money to pay the mortgage and costs related to the house and that, after his father's death, Salwah began making the mortgage payments for the Indiangrass residence. Tarek testified that he executed a special warranty deed in July 2020 to transfer the Indiangrass

---

[5]  In his main brief, Tarek acknowledges that the parties acquired legal title to the residence on December 19, 2006, and that "under the inception of title doctrine, the home is community property."

residence to Salwah because she had inherited the property after Mohamed's death in 2013.

May testified that she did not sign the 2006 contract or special warranty deed and did not learn of the existence of these documents until after she filed for divorce. May testified that Tarek told her they were going to purchase a home in the United States and that it would be their family home, and Tarek never told her that the Indiangrass residence was being purchased for Tarek's father.

In its written findings of fact and conclusions of law, the trial court found that Tarek and May signed the sale agreement to purchase the property while they were married and, therefore, the property was community property, and the community property presumption was not overcome by the evidence presented at trial. It found that the special warranty deed executed by Tarek on July 11, 2020, purportedly transferring the Indiangrass residence to Salwah, was void due to the failure to join May. It further found that the purported transfer of the community property to Salwah was inappropriate and without May's consent, and that Tarek could not transfer May's community property interest in the property without her consent. Tarek does not specifically challenge the trial court's Findings of Fact Nos. 5 or 6— that the special warranty deed was void and that Tarek's attempted transfer of the Indiangrass residence was improper. *See McGalliard*, 722 S.W.2d at 696 ("When findings of fact are filed and unchallenged, "they are binding on an appellate court

21

unless the contrary is established as a matter of law, or if there is no evidence to support the finding."); *Grupa*, 2015 WL 3423541, at *1.

Tarek also contends that May challenged the affidavit she executed on November 23, 2019—attesting that the Indiangrass residence was not part of the marital estate and she had no claim to it—based on the affirmative defense of duress. He argues that the trial court did not make any finding on May's affirmative defense of duress and therefore the trial court's judgment cannot be supported on appeal by such a presumed finding.[6]

---

[6]     Tarek cites *Gonzalez v. Razi*, 338 S.W.3d 167 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) in support of his argument that the trial court's judgment cannot be supported on a presumed finding. In that case, the Gonzalezes challenged the legal and factual sufficiency of the evidence supporting the trial court's determination that they did not comply with the requirements to redeem their property that had been sold at a tax foreclosure sale. *See id.* at 168, 174. On appeal, the appellee argued that the Gonzalezes did not comply with the requirements for redemption because (1) they did not pay the proper amount and (2) the affidavit that the Gonzalezes submitted to redeem their property was insufficient. *See id.* at 174. This Court noted that the trial court had found only that the Gonzalezes did not comply with the requirements for redemption because "they did not make the proper redemption payment within the required time period." *Id.* at 174–75. The court stated that "[w]hen the trial court provides findings, they form the basis of the judgment and that judgment may not be supported on appeal by a ground of recovery or defense not included in the findings of fact." *Id.* at 175. The court therefore only considered on appeal whether the Gonzalezes made the proper redemption payment and not whether the affidavit the Gonzalezes submitted to redeem their property was insufficient. *Gonzalez* is inapposite to this case. Here, May does not argue that the trial court's judgment is supported on appeal by the affirmative defense of duress but, rather, that the evidence is sufficient to support the trial court's findings that the Indiangrass property is community property and that Tarek did not overcome the community property presumption.

Contrary to Tarek's assertion, May did not plead duress as an affirmative defense to rebut a claim asserted by Tarek or as an affirmative claim for relief. *See generally* TEX. R. CIV. P. 94 (requiring parties to specifically plead matters that are affirmative defenses to matters pleaded in opponent's pleading and listing duress as defense that must be pleaded). Rather, she testified that she was terrified of Tarek after he threatened to take the children to Egypt and to harm May's mother and sister who still live in Egypt, and that she signed the affidavit because she did not want to lose her children or risk her family's safety. The trial court could consider this testimony as well as Tarek's testimony denying that he had threatened to take the children to Egypt or harm May's family if she did not sign the affidavit.[7]

The trial court in a bench trial is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Because it is the province of the trial court in a bench trial to resolve conflicting evidence, we must assume that it resolved all conflicts in accordance with its fact findings. *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 894 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005)). After considering only the evidence and inferences supporting the challenged finding and

---

[7] When the trial court orally rendered its ruling, Tarek's counsel asked if it had considered May's affidavit. The trial court responded that "it was absolutely considered by this Court."

23

disregarding all evidence and inferences to the contrary, we conclude that the evidence is legally sufficient to support the trial court's determination that the Indiangrass residence is community property and that Tarek failed to rebut the community property presumption. *See Sherman*, 760 S.W.2d at 242; *Robles*, 965 S.W.2d at 615. Further, after weighing all the evidence that was before the trial court, we conclude that the evidence was also factually sufficient to support the trial court's findings. *See Cain*, 709 S.W.2d at 176. We overrule Tarek's first and second issues.

## E.    Owelty of Partition

In his third issue, Tarek contends that the trial court erred in awarding the Indiangrass residence to Tarek as his separate property and divesting May of "all right, title, interest, and claim in and to that property," and then ordering that the property be sold after August 1, 2022 via an owelty of partition and that Tarek pay May from the proceeds of the sale. Tarek argues that the trial court cannot award him the Indiangrass residence, claim to divest May of all "all right, title, interest, and claim in and to that property," and then award an owelty lien to May that has the effect of divesting Tarek of his interest in the property (except for any proceeds remaining after May's owelty lien is satisfied, if any).

The trial court awarded May as her separate property "[t]he sum of two hundred three thousand seven hundred dollars ($203,700.00) to be paid by TAREK MOHAMED ZAGHLOUL . . . on or before 5:00 p.m. on August 1, 2022 and subject

24

to the terms and conditions herein below regarding the sale of the marital residence."

After having found that the Indiangrass residence was community property, the trial court divided this community asset by awarding the residence to Tarek as his separate property subject to the following provisions:

<u>Provisions Relating to Residence Including Payment for and Sale of Residence</u>

TAREK MOHAMED ZAGHLOUL shall pay to MAY ELSAYED the sum of $203,700.00 on or before 5:00 p.m. on August 1, 2022. IT IS ORDERED that TAREK MOHAMED ZAGHLOUL may either refinance the marital residence [] with a cash out option to pay MAY ELSAYED the sum of $203,700.00 and MAY ELSAYED IS ORDERED to sign any and all necessary documentation to effectuate the refinance of the marital residence. Should TAREK MOHAMED ZAGHLOUL not be able to refinance the property and pay MAY ELSAYED the sum of $203,700.00 on or before 5:00 p.m. on August 1, 2022, IT IS FURTHER ORDERED AND DECREED that the property and all improvements [] shall be sold under the following terms and conditions:

1.     The property shall be sold for a price that is mutually agreeable to Petitioner and Respondent. If Petitioner and Respondent are unable to agree on a sales price, on the application of either party, the property shall be sold under terms and conditions determined by a court appointed receiver.

. . . .

3.     Upon the sale of the residence, IT IS ORDERED that the net sale proceeds shall be distributed directly to the parties as follows:

a. 64.15% of the net sale proceeds shall be distributed to TAREK MOHAMED ZAGHLOUL.

b. 35.85% of the net sale proceeds shall be distributed to MAY ELSAYED.

25

Owelty of Partition

The Court, having awarded the family homestead of the parties to Respondent, finds that it is necessary to impose an encumbrance for owelty of partition against the entirety of the property to secure the payment of the debt resulting from the award.

IT IS ORDERED AND DECREED that an encumbrance for owelty of partition is imposed against the entirety of the [Indiangrass residence].

The purpose of the encumbrance is to secure the payment of the debt of Respondent in favor of Petitioner of two hundred three thousand seven hundred dollars $203,700.00 resulting from the award of the homestead in this divorce proceeding. The debt shall be payable as follows:

The sum of $203,700.00 shall be paid directly by cash, cashier's check, or money order by TAREK MOHAMED ZAGHLOUL to MAY ELSAYED on or before 5:00 p.m. on August 1, 2022.

To further evidence the debt, Respondent is ORDERED to sign a deed of trust to secure payment of the debt resulting from the owelty of partition.

This debt is part of the division of community property between the parties and shall not constitute or be interpreted to be any form of spousal support, alimony, or child support.

An "owelty" is defined as "[e]quality as achieved by a compensatory sum of money given after an exchange of parcels of land having different values or after an unequal partition of real property."[8] *Owelty*, BLACK'S LAW DICTIONARY 1214 (9th

---

[8] "[O]welty is the difference in value that results when a court divides property into shares of unequal value in partition proceedings." *Rodriguez v. Rivas*, 573 S.W.3d 447, 453 (Tex. App.—Amarillo 2019, no pet.) (citing *Sayers v. Pyland*, 161 S.W.2d 769, 772 (Tex. 1942)).

ed. 2009). An owelty lien is analogous to a vendor's lien creating an encumbrance which follows the land upon sale. *See Sayers v. Pyland*, 161 S.W.2d 769, 772 (1942). Owelty liens are appropriate where the court cannot partition real estate into equal shares without materially injuring its value. *See Crockett v. McSwain*, No. 11-00-00374-CV, 2001 WL 34373604, at *4 (Tex. App.—Eastland Nov. 1, 2001, no pet.). The court may divide the real property into unequal shares, order payment of an owelty to equalize the value of the shares, and then impose a lien on the greater share in favor of the recipient of the lesser share to secure the owelty payment. *See Sayers*, 161 S.W.2d at 772. Owelty liens against homestead property are expressly authorized by the Texas Constitution and can be used to effect an equal division of the entire marital estate.[9] *See* TEX. CONST., art. XVI, § 50.

Here, the trial court awarded the Indiangrass residence, with a net community value of $527,067.00, to Tarek as his separate property and divested May of any right, interest, title, or claim to the property. It awarded May the sum of $203,700.00 as her separate property and ordered that Tarek pay the sum of $203,700.00 to May.

---

[9] The Texas Constitution protects a party's homestead from forced sale for the payment of all debts with several exceptions, including "an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding." TEX. CONST. art. XVI, § 50(a)(3); *Schafman v. Schafman*, 01-20-00231-CV, 2022 WL 962466, at *3 n.1 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, no pet.) (mem. op.).

In the event Tarek did not pay May, the trial court ordered the property to be sold and that 64.15% of the net sale proceeds be distributed to Tarek and 35.85% of the net sale proceeds be distributed to May. Finally, it imposed an owelty lien on the entire property to secure payment of the lesser amount to May. *See Sayers*, 161 S.W.2d at 772.

Tarek has cited no authority—nor has our research revealed any—to support his assertion that a trial court cannot encumber the real property awarded to one spouse to secure payment of an owelty in partition to the other spouse. To the contrary, several courts of appeals, including this one, have addressed final decrees of divorce containing similar owelty lien provisions. *See, e.g.*, *LeBlanc v. LeBlanc*, No. 08-22-00218-CV, 2023 WL 4547817, at *1 (Tex. App.—El Paso July 14, 2023, no pet.) (upholding trial court's modification of owelty lien, imposed in final decree of divorce awarding parties' marital home to wife and divesting husband of all title and claim to property, reflecting requirement that $75,000 owed to husband upon refinancing would be paid by February 1, 2022 but, if not paid by said date, then, upon sale of home, net proceeds of sale would be distributed in such manner that wife would receive 52% and husband would receive 48%); *Schafman v. Schafman*, No. 01-20-00231-CV, 2022 WL 962466, at *7 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, no pet.) (mem. op.) (reviewing final decree of divorce in which trial court did not award wife any interest in parties' marital residence but instead placed owelty

on property and awarded wife $254,690.14 equalization judgment worth 30% of fair market value of property to be realized upon husband's sale of property); *In re Marriage of Hammit*, No. 07-04-0366-CV, 2005 WL 2923477, at *1 (Tex. App.—Amarillo Nov. 4, 2005, no pet.) (mem. op.) (upholding trial court's order clarifying final decree of divorce in which trial court awarded parties' homestead to husband and imposed encumbrance on homestead to secure husband's payment of owelty of partition to wife).

We overrule Tarek's third point of error.

**Division of the Community Estate**

In his fourth issue, Tarek contends that the trial court erred in awarding a disproportionate share of the marital estate to May. He argues that while a trial court can divide a marital estate unequally, there must be a reasonable basis to do so and the trial court abused its discretion in its disproportionate award. In his fifth issue, Tarek argues that the trial court erred in failing to divide or award certain marital property which significantly affected the overall distribution of the marital estate.

**A.     Standard of Review and Applicable Law**

Family Code section 7.001 provides that "[i]n a decree of divorce [], the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE § 7.001. The trial court has broad discretion when

dividing the marital estate at divorce, and we must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). "To disturb a trial court's division of property, a party must show that the court clearly abused its discretion by a division or an order that is manifestly unjust or unfair." *Hubbert v. Hubbert*, No. 01-20-00065-CV, 2021 WL 4780090, at *2 (Tex. App.—Houston [1st Dist.] Oct. 14, 2021, no pet.) (mem. op.) (quoting *Barras v. Barras*, 396 S.W.3d 154, 164 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)). A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without any reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). Each spouse has the burden to present sufficient evidence of the value of the community estate to enable the trial court to make a just and right division. *Christensen v. Christensen*, No. 01-16-00735-CV, 2018 WL 1747260, at *4 (Tex. App.—Houston [1st Dist.] Apr. 12, 2018, no pet.) (mem. op.).

The division must be equitable, but the trial court does not have to divide the marital estate equally. *Murff*, 615 S.W.2d at 698–99. If there is a reasonable basis for an unequal division of the property in the record, the trial court has not abused its discretion. *Fuentes v. Zaragoza*, 555 S.W.3d 141, 162 (Tex. App.—Houston [1st Dist.] 2018, no pet.). In exercising its discretion, the trial court "is empowered to use its legal knowledge and its human understanding and experience" and "has the

30

opportunity to observe the parties on the witness stand, determine their credibility, [and] evaluate their needs and potentials, both social and economic." *Murff*, 615 S.W.2d at 700. Various factors are relevant and may properly be considered in dividing the community property estate under Family Code section 7.001. *Id.* at 699; *Christensen*, 2018 WL 1747260, at *5.

**B.     Disproportionate Division**

In Finding of Fact No. 34, the trial court stated that it took into consideration the following factors in making a determination of a just and right division: (a) length of marriage, (b) reasons for divorce and fault in the breakup of the marriage, (c) benefits the innocent spouse may have derived from the continuation of the marriage, (d) disparity in earning power, (e) contributions to the home, (f) custody of minor children, (g) needs of the children, (h) community indebtedness and liabilities, (i) health and age of each spouse, (j) nature of the property involved in the division, (k) wasting of community assets by a spouse, (l) gifts to or by a spouse during the marriage, (m) education and future employability, (n) tax consequences of property division, (o) attorney fees for the parties, (p) foreign property outside the court's jurisdiction, (q) spouses' capacities and abilities, (r) business opportunities, (s) relative financial condition and obligations, (t) size of separate estates, and (u) the nature of the property.

This record establishes several circumstances that justify awarding a disproportionate share of the community estate to May. Regarding fault in the breakup of the marriage, May testified that the home environment was chaotic and that Tarek regularly intimidated her and the children. She testified that Tarek kept guns around the house, had punched holes in the wall, and knocked their daughter's bedroom door down. She testified that Tarek threatened to take the children to Egypt and hurt May's mother and sister who still lived in Egypt if she did not sign the affidavit stating that she had no interest in the Indiangrass residence. Tarek denied that these events occurred. However, as the sole judge of the witnesses' credibility and the weight to be given to their testimony, the trial court could have believed May's testimony and not credited Tarek's. *See Golden Eagle Archery*, 116 S.W.3d at 761.

Tarek argues that the trial court could not consider fault in the breakup of the marriage because the trial court granted the divorce only on the ground of insupportability. However, the fact that the trial court granted the parties a no-fault divorce is not inconsistent with and did not preclude the trial court from considering Tarek's conduct toward May and the children in its division of the marital estate. *See* TEX. FAM. CODE § 6.001 (providing that trial court "may grant a divorce without regard to fault if the marriage has become insupportable"); *Mohindra v. Mohindra*, No. 14-06-00056-CV, 2007 WL 3072057, at *2 (Tex. App.—Houston [14th Dist.]

Oct. 23, 2007, no pet.) (mem. op.) ("Courts, including this one, have acknowledged that fault may be considered [as factor in dividing marital estate] even in the context of a no-fault divorce."); *In re Brown*, 187 S.W.3d 143, 145–46 (Tex. App.—Waco 2006, no pet.) (concluding that trial court has discretion to consider "proven fault" in division of property regardless of basis for granting divorce); *Goodfellow v. Goodfellow*, No. 03-01-00633-CV, 2002 WL 31769028, at \*5 (Tex. App.—Austin Dec. 12, 2002, no pet.) (stating that "fault may be considered by a court in making a property division"); *see also Vautrain v. Vautrain*, 646 S.W.2d 309, 312 (Tex. App.—Fort Worth 1983, writ dism'd) ("It is discretionary with the court, once it decides to hear the divorce on the ground of the no fault basis, as to whether or not he shall consider the matter of fault involved in the divorce case."); *Clay v. Clay*, 550 S.W.2d 730, 734 (Tex. App.—Houston [1st Dist.] 1977, no writ) (noting that trial court was authorized to consider jury's finding that wife's conduct toward husband constituted cruel treatment in dividing parties' estate when divorce was granted on no-fault grounds).

Regarding disparity in the parties' earning power, their education, and future employability, Tarek testified that he holds an engineering degree with a minor in business. He testified that he earned $30,000 a year prior to 2019 but that he was unemployed at the time of trial. He testified that he has applied for higher-paying jobs but has been unable to secure that type of employment because he was

previously found to have committed family violence. Tarek testified that he has not applied for lower-paying jobs because he would be subject to wage garnishment, and that he does not believe earning minimum wage is better than earning nothing. The trial court found that Tarek had the ability to be employed and earn at least minimum wage of $7.25 an hour. May testified that she holds a bachelor's degree in information technology and a master's degree in education. She testified Tarek did not permit her to work during the twenty-year marriage because he wanted her to stay home and take care of the children. The trial court could have reasonably concluded from the evidence that May's absence from the workforce while caring for their four children would affect her wage-earning capacity. It could have also considered the twenty years May spent at home taking care of the children as a significant contribution to the community and to Tarek's higher wage-earning power.

As to the custody and needs of the minor children, the parties were appointed as joint managing conservators of the children and May was awarded the right to designate the children's primary residence. May testified that her younger son was diagnosed with ADD and DMDD (disruptive mood dysregulation disorder), and her older daughter was diagnosed with DMDD for which she is taking medication and receiving therapy. She testified that the children are doing well now but that the two children require special attention due to their mental health issues.

As to community indebtedness and liabilities, the evidence showed that the community estate had amassed debt in the amount of $404,447.00. The trial court noted at its oral rendition that it was awarding Tarek the lion's share of the debt. However, the evidence also demonstrated that much of the debt apportioned to Tarek arose from debts only in his name or related to his solely owned businesses.

Based on this record, the property division was not so manifestly unfair as to constitute an abuse of discretion. *See Hubbert*, 2021 WL 4780090, at *2. Because we cannot conclude that the trial court abused its discretion in its division of the marital estate, we overrule Tarek's fourth issue.

## C. Other Marital Property

In his fifth issue, Tarek argues that the trial court erred in failing to divide or award certain marital property which significantly affected the overall distribution of the marital estate. Specifically, he complains of the trial court's (1) failure to divide and award the second floor of an apartment in Giza, Egypt; (2) the award of debts related to Zaghloul Consultancy; and (3) the award of debts related to EZ World Transport. We consider each of these complaints in turn below.

### 1. Apartment in Giza

Tarek contends that May purchased an apartment in Giza in 2017 and that because she acquired it during the marriage and it is in Egypt, the property is quasi-community property. Pointing to his Exhibit 17 and testimony that the Giza

35

apartment was worth $200,000.00, he argues that the trial court's failure to divide and award the Giza apartment was error because $200,000.00 is not de minimis.

Exhibit 17 appears to be a lawsuit filed by May in Egypt seeking a judgment to declare another individual's signature on a contract for the sale of an apartment valid. The record, however, does not contain the contract in question or a property deed establishing ownership of the apartment. Further, when asked by his counsel how much he "believed that [the apartment] sold for," Tarek testified that "based on the average price in the area, the second floor alone is worth about $220,000." There is no evidence showing that the apartment was sold or a sales price. Based on this record, the trial court did not abuse its discretion in determining that there was insufficient evidence presented related to this property and its value to consider this property part of the community estate. *See Christensen*, 2018 WL 1747260, at *4 (stating each spouse has burden to present sufficient evidence of value of community estate).

### 2. Debt of Zaghloul Consultancy

Tarek next contends that the trial court erred regarding the debt related to Zaghloul Consultancy. He argues that while the trial court found Zaghloul Consultancy did not have any value, it also awarded the remaining proceeds related to an EIDL (Economic Injury Disaster Loan) and SBA (Small Business Administration) loan in the amount of $121,500.00 to Tarek. He argues that because

the trial court did not order him to pay back the $121,500.00 loan with the $89,620.55 in remaining loan proceeds, the trial court erred in finding that the debt was only $31,812.00 when in fact the actual debt was $121,500.00.

At trial, Tarek testified that Zaghloul Consultancy and Brokerage took out an SBA loan of $121,000, he used approximately $32,000 of the funds, and $89,000 of the original loan amount remained. Although the terms for the loan stated that he could only use those funds as capital funds for business purposes, he testified that he borrowed approximately $32,000 of the loan for his legal fees, personal expenses, and bills, and that he would have to pay back those funds. During cross-examination, the following exchange took place:

> Q: But you're asking this Court—but you're asking this Court today to consider those SBA loans in the community division of the estate.
>
> A: No, no, no, no. I'm asking only the 32,000, not 141,[10] just the 32,000. I'm asking the Court to award to Zag Consultancy, and this is my debt and I'm responsible for it. She has no responsibility whatsoever.

In the final decree, the trial court awarded the debt associated with the SBA loan for Zaghloul Consultancy in the amount of $31,812 to Tarek. The record shows that Tarek admitting to borrowing $32,000 for his personal expenses. The trial court did not err in awarding this debt to Tarek.

---

[10] The loan amount was approximately $121,000, as Tarek previously testified, not $141,000.

### 3. Debt of EZ World Transport

Tarek argues that the trial court erred in failing to award the debt related to EZ World Transport to the community estate. He asserts that EZ World had two debts: a $74,000 debt owed for a 2016 International Prostar truck and a $30,204 debt owed to Fundation. He argues that the trial court erred in failing to include and apportion these community debts.

As with Zaghloul Consultancy, the trial court awarded EZ World Transport—both assets and debts—to Tarek. At trial, Tarek asked the trial court not to consider the business's debts as part of the marital estate because he and other members signed the guarantee for the loan:

Q: Now, you're asking this Court to consider that you have over $200,000 in debt for a business or businesses that generated only $30,000 a year in income. Explain to me how those businesses were ever profitable, sir.

A: Okay. Zag Consultancy is the one that generated income, $30,000. EZ World Transport has never generated income (indiscernible).

Q: Yet, you're asking this Court to award you all this debt associated with EZ World Transport when you testified you got multiple members within that company.

A: I am not asking the Court to award me the debt. I'm asking the Court to consider that that is not the marital property because I signed the debts as (indiscernible) and it is legally LLC members are protected from any debt except (indiscernible). And I also mentioned that my brother was (indiscernible), another $150,000 or so and they are going after him for that. It was the active members who signed the guarantees, and that includes the trucks and credit cards and everything that—every loan the company took to survive had the

38

guarantee. I was one of the guarantors. My brother was the guarantor of (indiscernible). And all the other members are protected by the SBA loan, limited liability.

Based on this evidence, the trial court did not err in not allocating the debt associated with the SBA loan for EZ World Transport to the marital estate.[11]

Accordingly, we overrule Tarek's fifth issue.

## Conclusion

We affirm the trial court's final decree of divorce.

Amparo Monique Guerra
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Guerra.

---

[11] In a footnote, Tarek contends that the final decree does not include two debts listed in the trial court's written findings: A Chase United card in the amount of $5,000 and a Discover card in the amount of $21,857. He states that he is not able to tell if the $21,875.00 balance related to the Discover card has been listed on the decree because of the redactions on the decree and the findings which make it impossible to tell what account is listed on either.

The trial court did not specifically list a Chase United card with a balance of $5,000 and a Discover card with a balance of $21,857 in the decree. However, the trial court nonetheless included this debt by stating in the paragraph immediately following the enumerated debts that Tarek should also pay "All debts, charges, liabilities, and obligations incurred solely by Respondent from and after March 15, 2022 unless express provision is made in this decree to the contrary." *See Graves v. Tomlinson*, 329 S.W.3d 128, 149 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (finding trial court did not disregard appellant's debts in divorce decree where court did not specifically list Sam's Club account; court concluded that trial court included this debt by stating in paragraph immediately following list of debts that appellant should also pay "Any and all debts, charges, liabilities, and obligations incurred solely by SANDRA C. GRAVES from and after September 25, 1997, unless express provision is made in this decree to the contrary.").